PROVOSTY, J.
Under the federal homestead law, any head of a family, or person 21 years old, who is a citizen of the United States, or has filed his declaration of intention to become such, as required by the naturalization laws, may acquire 150 acres, or less, of public land without purchasing the land, but by simply paying certain fees and fulfilling certain conditions. First, he must enter the land, as the expression is; that is to say, he must apply at the local public land office for permission to enter the land, pay $5 if he enters 80 acres or less, and $10 if he enters more, and make and file an affidavit that he possesses the qualifications mentioned above, and that he makes the entry for his own exclusive use and benefit, and for the purpose of actual settlement and cultivation. He must then reside upon and cultivate the land for the five years immediately following, without changing his residence or abandoning the land for more than six months' at any time. At the end of the five years, and within two years thereafter, he may, upon taking an oath of allegiance to the government of the United States, and making affidavit that he has not alienated any part of the land, and proving by two credible witnesses his residence upon and cultivation of the land for the five years, obtain a certificate, and, finally, on the strength of the certificate, obtain a patent.
Taking advantage of this law, Magloire Crochet entered 152 acres, and lived upon and cultivated the same for the five years following. He did this in the lifetime of his wife, between whom and himself the community of acquets and gains existed. After the death of his wife he made the final proofs, as they are called; that is to say, he took the oath of allegiance, made the affidavit of nonalienation, and made the required proof, by two credible witnesses, of residence and occupation, and paid the fees of the officers of the land office, amounting to $8.
He then sold the property as belonging in its entirety to himself.
His children bring the present suit against his vendees, claiming that, the land having been acquired during the existence of the community of acquets and gains, it fell into the community, ‘and that they, as heirs of their mother, are owners of an undivided half of the same. They rely upon article 2102, Civ. Code, reading as follows:
“This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estates which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase.”
Defendants contend that the land was acquired after the dissolution of the community by the death of the wife, and that consequently it did not fall into the community; that the acquisition of the land by the homesteader dates from the making of the final proofs, or, rather, from the issuance of the certificate of their having been made; and that these final proofs were made after the death of the wife.
Naturally, on the question thus raised, the governing law is the homestead statute itself. Our laws can have sway only in the silence of the homestead statute, or from the point where the homestead statute ceases to *6 operate. Defendants do not impugn the correctness of the decisions heretofore rendered by this court, to the effect that the property acquired under the federal homestead law during the existence of the community falls into the community. Brown v. Fry, 52 La. Ann. 58, 26 South. 748.
In support of their contention defendants say that, until the certificate has issued, the 'homesteader cannot dispose of any part of the land by sale, mortgage, or lease, and it is not liable for his debts, and in case he dies no interest in it remains in his estate; nnd they argue that until then he cannot be said to be owner; They invoke the decision of this court in the case of Richard v. Moore, 110 La. 435, 34 South. 593, where it was held that in case the homesteader dies before the ■expiration of the five years, and his widow continues to reside upon and cultivate the land for the remainder of the time, and makes the final proofs, the title vests exclusively in her, and not in the community of acquets and gains which existed between her and her husband.
That argument is only specious, and the decision is not in point. The government, in offering to the homesteader the opportunity to acquire the property, is- at liberty to impose such conditions as it chooses, and one -of the conditions expressly imposed is that in case he dies before the making of the final proofs whatever rights exist under the •entry and the occupation and the cultivation shall pass to his widow, and in her default to his heirs, and only in default of such heirs to his devisees. The homesteader takes the land subject to that express condition. The decision in the ease of Richard v. Moore enforced that provision of the statute, and both it and the statute it enforces are totally inapplicable to a case like the present one, where the homesteader has not died. It is not true that the homesteader has no interest in the land, since, in default of widow or heirs, the statute expressly x>ermits him to devise an interest in it. He could not devise an interest in the land if he had none. It is not true that he may not mortgage. A. & E. E. of L. vol. 27, p. 412. Nor is it true he may not lease any part which he himself is not occupying and cultivating, or sell his interest such as it is.
Section 2297, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1398], provides that under certain contingencies the land “shall revert to the government.” Now it is not possible for the land to “revert to the government” unless it has passed out of the government and to the homesteader. To that effect is an opinion given by Attorney General McVeagh to the Secretary of War as follows:
“It is true a certificate of entry is not then given, the certificate being, under section 2291, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1390], withheld until the expiration of five years from the date of such entry, at the end of which period, or within two years thereafter, upon proof of settlement and cultivation during that period, and payment of the commissions remaining to he paid, it is issued; hut upon entry the right in favor of the settler would seem to attach to the land, which is liable to be defeated' only by failure on his part to comply with the .requirements of the homestead law in regard to settlement and cultivation. This right amounts to an equitable interest in the land, subject to the future performance by the settler of certain conditions (in the event of which he becomes invested with full and complete ownership), and, until forfeited by failure to perform the condition, it must, I think, prevail, not only against individuals, but against the government. That, in contempla-' tion of the homestead law, the settler acquires by his entry an immediate interest in the land, which, for the time at least, thereby becomes severed from the public domain, appears from the language of section 2297, Rev. St. U. S., wherein it is provided that in certain contingencies ‘the land so entered shall revert to the government.’ 1 Copp. Pub. Land Laws 1882, p. 388.
“Section 2288, Rev. St. U. S. [U. S. Oomp. St. 1901, p. 1385], provides that before the expiration of the five years the homesteader shall have the right to sell any portion of the homestead for church, cemetery, or school purposes, or for a right of way to a railroad. The statute provides that such sale ‘shall in no way vitiate the right to complete and perfect the title.’ None but an owner can sell. Hence the allowance or recognition of such a right is entirely inconsistent with a negation of the ownership of the homesteader; and none but one who has a title of some kind can ‘complete and perfect his title.’ ”
*8 Under the statute, therefore, there comes into existence, in favor of the homesteader, as an effect of the entry, a certain right which, in the language of Atty. Gen. Mc-Yeagh, “attaches to the land”; that is to say, there is established between the homesteader and the land a direct relation, by virtue of which he is invested with the moral power of holding it as against the whole world, the government included, and of appropriating the fruits, and by virtue of which he is further invested with the absolute right to a patent upon fulfilling certain conditions entirely potestative on his part—a right defeasible only in the event that before the fulfillment of the conditions he dies, leaving a widow or heirs. Now, if this relation between the homesteader and the land be not an ownership, what is it? If not an ownership, how is it to be classed in our system of land tenure? Evidently it is what is described by our Code as an imperfect ownership, by which is meant an ownership which does not invest the titulary with the right to use, enjoy, and dispose of the property in an unlimited manner. It is furthermore a conditional ownership. But an imperfect conditional ownership, under our Code, is an ownership; and under our Code the accomplishment of a condition has a retroactive effect to. the moment of the birth of the conditional right, whereby matters are placed in the situation in which they would have been, if, from the beginning, the right had been absolute.
The articles of our Code on the subject of imperfect ownerships, and of conditional obligations or contracts or rights, are the following:
“Article 490. Ownership is divided into perfect and imperfect.
“Ownership is perfect when it is perpetual, and when the thing is unincumbered with any real right towards any other person than the owner.
“On the contrary, ownership is imperfect, when it is to terminate at a certain time or on a condition; or if the thing, which is the object of it being an immovable, is charged with any real right towards a third person; as a usufruct, use or servitude.”
“Article 492. -Imperfect ownership only gives the right of enjoying and disposing of the property, when it can be done without injuring the rights of others; that is, of those who may have real or other rights to exercise upon the same property.”
“Art. 2021. Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens,, it is then a resolutory condition.
“Art. 2022. Conditions, whether suspensive or resolutory, are either casual, potestative or mixed.
“Art. 2023. The casual condition is that which depends on chance, and in no way in the power either of the creditor or of the debtor.
“Art. 2024. The potestative condition is that which makes the execution of. the agreement depend on an event, which it is in the power of the one or the other of the contracting parties to bring about or to hinder.
“Art. 2025. A mixed condition is one that depends at the same time on the will of one of the parties and on the will of a third person, or on the will of one of the parties and. also on a casual event.”
“Art. 2028. The contract of which the condition forms a part is, like all others, complete-by the assent of the parties; the obligee has a right of which the obligor cannot deprive him; its exercise is only suspended, or may be defeated, according to the nature of the conditions.”
“Art. 2041. The condition being complied with, has a retrospective effect to the day that the engagement was contracted; if the creditor dies before the accomplishment of the condition,, his rights devolve on his heirs.”
Examples of such imperfect and conditional and defeasible ownerships readily suggest themselves. The ownership subject to usufruct, or that is burdened with servitude, or subject to the right of redemption, are instances of imperfect ownership; and the following are instances of conditional ownerships : Where the purchaser at a sheriff’s-sale does not pay the price, the situation, so far as the title to the property is concerned, is just as if he had not bought at all, and yet, if he pays the price, his ownership dates from the adjudication. And so with the heir who purchases at the succession sale, and *10 avails himself of the privilege extended to him, by art 1343 of the Code, of withholding the price until a partition of the estate can be made. His title is conditional upon payment of the price, and, if he fails to pay, his title fails, and all the incumbrances he may have put upon the property fail with it Bank v. David, 49 La. Ann. 136, 21 South. 174. A still more striking example of an infirm title is that of a purchaser at a sale, made under Act 82, p. 104, of 1884, of land acquired by the state at tax sales. If he fails to pay the taxes which accrued on the property subsequent to December31,1879, he virtually has no title at all ((Remick v. Lang, 47 La. Ann. 914, 17 South. 461); but he may pay these taxes at any time, and therebyperfecthis title (Muller v. Mazerat, 109 La. 116, 83 South. 104). In this last instance the purchaser has the mere shell of a title without the substance. An example of his having all the substance of the title, and not its shell, would be if he paid the price and went into possession before the act had been passed. It goes without saying that in a sale by private contract the parties may stipulate such conditions and modifications as they please, so long as they do not offend good morals or public policy, or seek to create tenures reprobated by our laws. For instance, they might agree that the sale should be subject to the same conditions as are imposed by the homestead law upon the homesteader. In all of the foregoing cases the property must be considered to have been acquired at the time that the imperfect conditional title, such as it was, became vested in the purchaser subject only to the conditions imposed upon the title, and these conditions, when accomplished, have, in the language of article 2041 of the Civil Code, “a retroactive effect to the day that the engagement was contracted”; that is to say, to the day that the conditional right had its birth.
Treating of the effects of conditions, Marcado, in his Commentary on article 1179 of the Code Napoleon, says:
“The conditional obligation, and, for the matter of that, every conditional right, whatever may be its nature, is not a right which will exist, or will not exist (in the future), accordingly as such an eventuality may or may not come to pass. It is a right which, under tha contemplated condition, exists, or does not exist, at the present time. The right has not, and will never have, any existence, if the condition is not accomplished. It has, on the contrary an actual existence, if the condition is subsequently accomplished. The formula of the conditional obligation is not, T will owe you, if, * * * ’ but it is, T owe you, if * * =s j The obligation which would come under the formula, T will owe you, if, * * * ’ would be not alone conditional, but also with a term. The accomplishment of the condition has, then, a retroactive effect to the moment itself of the contract.”
“After the happening of the condition the situation is the same as if the obligation had come into existence at the moment of the contract and had been at once perfect.” Ban-dry-Lacantinerie, Obi. vol. 2, p. 35, No. 809.
“The right resulting from the engagement is considered as having vested in the contractee from the moment of the contract.” Pothier, Obl. No. 220, p. 112.
A claim due only conditionally belongs to the community, even though the condition is not accomplished until after the dissolution of the community. Duranton, vol. 14, No. 109; Toullier, vol. 12, No. 109; Troplong, vol. 1, No. 365; Rodiere et Pont, vol. 1, No. 366.
Property bought before the marriage under a suspensive condition by one of the spouses remains his or her separate property, though the condition is realized after the marriage. Pothier, Communauté, n. 157; Duranton, vol. 14, n. 171; Rodiere et Pont, vol. 1, n. 518; Lâurent, vol. 21, n. 290; Baudry-Lacantinerie, vol. 53. No. 54.
The same effect of retroactivity attends the accomplishment of the suspensive condition as of the resolutory. Article 2041 makes no distinction in that regard. “L’art. 1179 étant concu dans les termes les plus généraux, le principe de la rétroactivité s’applique dans le systeme de notre code civil que la condition soit suspensive ou qu’elle soit résolutoire.” Bandry-Laeantinerie, Des Obl. vol. 2, p. 39, No. 810. But as a matter of fact the conditions attached by the homestead *12 law to the ownership acquired by the homesteader by his entry are resolutory, and not suspensive. The government does not say, “The land will go from me to you, if you do these things,” but it says, “the land shall revert to me, if,” etc.
If the ownership, such as it is, were intended to be suspended until the accomplishment of the conditions, the homesteader would not be permitted to exercise the right of occupying and enjoying the property, and making the fruits his own and, under limitations, to dispose of it.
In the case of U. S. v. Ball (O. 0.) 31 Fed. 667. the court said:
“In this matter the United States is to be regarded as any other vendor of real property, and the settler, prior to the issue of the certificate, as a vendee of such property, in possession under an uncompleted contract of purchase.”
In the case of United States v. Turner (O. O.) 5é Fed. 228, the court said:
“It is clear to me that he has the right to giant any part of his possession and equitable interest to any other persons for their use and enjoyment, so long. as they do no damage to the freehold or contingent reversionary interest of the government.”
Under the interpretation contended for by defendant the homesteader would have acquired nothing by the entry, nothing by his five years of work. The fruits of the labor and industry of the spouses for five long and arduous years would not have fallen into the community; but thereafter, suddenly, the making of certain proofs—the fulfillment of a formality, the work of a brief hour— would endow the husband alone with what it had taken all this time and labor to earn. This would accord too little with the equities of the situation. The five years’ occupation and cultivation of the land is in the nature of a price paid for it. The settler pays no money, but he pays by means of his five years’ services bestowed upon the improve-’ ment of the land. The well-known object which the government has in view is the opening up and settlement of the waste places of the country. That is what it gets in return for the conveyance of the land. Now, during these five years the wife and partner in community was a colaborer by the side of the homesteader, and she, by her coequal services, earned one-half of the property. This five years’ residence is the consideration which" the government exacts for the land. The final proofs are but matter of form—of essential form, it is true, still of mere form—the passing of the act of sale, as it were, after the contract itself has come into existence and had full operation.
As stated by Chief Justice Marshall in Delassus v. U. S., 9 Pet. 117-133, 9 L. Ed. 71:
“No principle is better settled in this country than that an inchoate title to lands is property.”
Our conclusion is that from the moment of the entry Magloire Crochet had a conditional ownership of the land, and that the accomplishment of the conditions under which he held it retroacted to the date of the entry, and that consequently the land was acquired during, and fell into, the community.
Magloire Crochet suffered more than seven years to elapse between his entry and the final proofs, and it is argued that he thereby forfeited his rights under the entry, and, as a consequence, acquired the land solely by the effect of the patent; but, plainly, if he acquired the land at all, it was under the homestead law, and as an effect of the entry and the five years’^occupation and cultivation.
The defendants are Jos. Bertrand for 50 acres of the land, and Geo. G. McCamant for the remainder.
McCamant has called his vendors, Isaac D. L. Williams and John H. Cooper, in warranty, and has prayed that in ease he is evicted he be given judgment against his said vendors for the price he paid them for the property, $3,360, together with interest thereon at the rate of 6 per cent, from February 23, 1901, the date of his acquisition of the property.
Jos. Bertrand calls his vendor in warranty, *14 and urges many defenses, but presumably bas abandoned tbe case, as he has made no appearance in this court.
MeCamant, not having asked that the sale by which he acquired the property should be dissolved, is entitled to recover from his warrantors only for the part from which he is evicted; that is to say, one-half. He is entitled to recover interest only in the event he is ever called upon to restore the fruits and revenues.
The suit has been dismissed as to the interest of Augustin Crochet in the 50 acres held by Jos. Bertrand.
It is therefore ordered, adjudged, and decreed that the plaintiffs Emerand, Emile, Joachim, Augustin and Odressy Crochet, and Dyskda Crochet, wife of Jean Simon, have judgment against Geo. MeCamant for the one undivided half of the following described property situated in the parish of Calcasieu, to wit: Fractional S. W. % and the fractional S. % of the N. W. % of section 14, township 8 S., range 3 W., except 40 acres of the north part of said S. % of the N. W. % of said section 14, containing 112 acres, more or less, and be put in possession thereof as owners.
.It is further ordered, adjudged, and decreed that the same above-named plaintiffs, except Augustin Crochet, have judgment against Joseph Bertrand for six-sevenths of the undivided one-half of the following described property situated in the parish of Calcasieu, to wit: Fifty arpents of land in the S. V2 of the N. W. fractional quarter of section 14, township 8 S., range 3 W., and be put in possession thereof as owners.
It is further ordered, adjudged, and decreed that Geo. MeCamant have judgment against Isaac D. L. Williams and John M. Cooper jointly, as warrantors, for the sum of $1,680, with right reserved to the said Geo. MeCamant to claim interest on said sum from the date of his purchase, in case he is ever required to pay rents and revenues for the land whereof he is evicted by the present judgment.
It is further ordered, adjudged, and decreed that the call in warranty and the re-conventional demand of Jos. Bertrand herein be dismissed as in case of nonsuit.
It is further ordered, adjudged, and decreed that the defendant Geo. MeCamant pay one-half of the costs of this suit, and have judgment against his sai'd warrantors jointly for like amount.
It is further ordered, adjudged, and decreed that Jos. Bertrand pay one-half of the costs of this suit, with reserve of right to claim reimbursement from his warrantors.
BREAUX, C. J., concurs in the decree.