350 So.2d 187 (1977)
JEFFERSON PARISH SCHOOL BOARD
v.
ROWLEY COMPANY, INC., et al.
No. 8263.
Court of Appeal of Louisiana, Fourth Circuit.
August 29, 1977.
Rehearings Denied October 12, 1977.
Writs Refused November 23, 1977.
*189 Jack A. Grant, Gretna, for plaintiff-appellant.
Rene R. Nicaud, Nicaud, Justrabo & Rousset, New Orleans, for defendant-appellee.
William A. Porteous, III, Porteous, Toledano, Hainkel & Johnson, New Orleans, for defendant-appellant.
Before REDMANN, STOULIG and BOUTALL, JJ.
REDMANN, Judge.
During renovation of a school building a fire of unknown cause destroyed $36,148.15 of laboratory tables, cabinets, etc. intended to be installed into a science laboratory. Plaintiff school board seeks judgment that the loss must be borne by defendant Rowley Company, Inc. (which furnished and was to install the destroyed goods) or by the board's own insurer. Rowley reconvened for the same amount, since that amount, although previously paid, had been withheld from other moneys due to Rowley. From a judgment condemning the board's insurer for the loss and granting Rowley's reconventional demand, both the board and the insurer appeal. We reverse.

The Board-Rowley Dispute
The board-Rowley question is one of contract law. The board's theory[1] of its non-liability to Rowley is that the terms of the advertisement for public bidding expressly bound bidders to "general conditions" including an obligation to protect one's own work and replace damaged work and to provide builder's risk insurance; that Rowley's bid form expressly averred Rowley had "received and carefully examined the . . . general conditions of the contract" and had a "clear understanding of the said documents", and promised performance "in accord with the drawings, specifications, and contract documents"; and that the board accepted in the form of a purchase order "as per bid", thus completing the contract as originally advertised for public bidding.
The trial judge's reasons noted Rowley's position that the substitution of a "purchase order" for a "formal contract"[2] *190 waived all requirements of the advertised contract except "specifications covering the actual work" (a waiver Rowley felt had also occurred on its eight or nine other contracts with the board during the four preceding years when it had similarly obtained no performance bond or insurance). The judge concluded "that with respect to the builder's risk [insurance] requirement there was no meeting of the minds . . . . Therefore, the court finds that the insurance provisions are not binding upon the parties."
We disagree. If public bidding is an honest attempt at getting the best value for tax moneys, then every bidder must be held bound by the terms of the advertising. If one bidder knows that his price need not include some item specified (here, insurance and bond), then that bidder can charge more for what he does yet underbid others without disclosing that his bid is one with a qualification. In this very case, the lowest bidder's bid was rejected as a "qualified bid" because it provided for delivery later than the specifications' date. If Rowley's bid had expressly rejected the specified provisions for insurance (and protection and replacement of its work), Rowley's bid would, other bidders must hope, also have been rejected.
We deem it a matter of public policy, inherent in the law of public bidding, that the successful bidder is estopped to deny a "meeting of the minds" on clearly expressed contractual provisions. Nor can the public body advertising for bids alter the clear specifications by issuing a "purchase order" rather than the formal contract that the advertised specifications provided.
Here, the specifications were clear. They were not subject to misunderstanding and, Rowley's vice-president testified, they were not misunderstood.[3] Rowley knew that its bid included insurance, but relied on its past experience to conclude that no one would request insurance.
The clear contract terms include in the General Conditions:
13. Protection of Work and Property Emergency: Contractor shall at all times safely guard owner's property from injury or loss in connection with [sic] this contract. He shall at all times safely guard and protect his own work, and that of adjacent property, from damage. Contractor shall replace or make good any such damage, loss or injury unless such be caused directly by errors contained in contract or by Owner . . . .
There is no suggestion that the loss-causing fire is attributable to contract error or to the owner.
General Condition 25(e) further required the contractor "to maintain Builder's Risk Insurance (fire and extended coverage) on a 100% completed value basis" and the Supplemental General Conditions, prepared exclusively for the science equipment contract, in item 10 provides:
Insurance requirements shall be as noted in General Conditions and shall be in amounts as follows: . . . D. Builder's Risk: Fire and Extended Coverage. . . (100% of value of Contract *191 written in name of Contractor and Owner as their interest may appear).
Rowley is obliged under general condition 13 to "replace or make good" the damage not caused by contract error or by the board as owner. Rowley is also obliged under general condition 25 and supplemental general condition 10 to provide builder's risk insurance. Rowley thus bears the loss, either directly under its obligation to replace or indirectly for breach of its obligation to insure.[4] The judgment in Rowley's favor must therefore be reversed.

The Board-Insurer Dispute
The Board's property insurer is liable to the board only if the board has suffered a loss of its property. Whether one characterize the board-Rowley bargain as sale, building contract, or some innominate hybrid (see C.C. 1777), at some point all elements of the science laboratory certainly were to become the property of the board. Insofar as the insurer's liability is concerned, the determinative question is whether title passed prior to the fire.
The trial judge concluded that the bargain was a sale, because of the name "purchase order" printed on the one-page last document of the multi-documented series, because a board representative inspected the goods after delivery and (as General Condition 23 specified) the board paid 90% of invoices for equipment delivered, and because the great bulk of the contract price (68.6%) was for the laboratory work-tables (with troughs, pipe-lines, etc.), cabinetry and the like, while the cost of affixing those items to the building and "scribing" them to precisely fit floors and walls was but a minor part (3.7%) of the price (the remainder being 1.8% "receiving, unloading and storing" and 11.9% assembly of the materials, 10% profit, and 3.9% tax). The trial judge cited C.C. 2467, 2468, 2475, 2477, 2478 and 1908 and Hunt v. Suares, 1836, 9 La. 434, and Vico Concrete Co. Inc. v. Antley, La.App. 2 Cir. 1973, 283 So.2d 830.
The cited Code articles relate to delivery and to risk of loss after a sale, except a sale with a suspensive condition. They do not aid in deciding whether our contract was a sale or, if a sale, whether one with a suspensive condition.
Hunt did not even involve a simple contract to furnish and install, much less require the conclusion that such a contract is a sale if the furnishing costs more than the installing. Hunt was not a one-price contract case, but one "to recover the price of various articles, as detailed in [plaintiffs'] account, which they allege were sold" to defendant. The defendant
"aver[red] that he had made a contract with the plaintiffs for the building and putting up of certain marble mantle and chimney pieces . . . but there is no positive evidence of such a contract as is set up by the defendant. . . .
It appears to us from the evidence that the principal contract was one of sale of the mantle pieces ready made, and that the agreement to put them up and furnish materials for that purpose, does not take the contract as to the mantle pieces out of the rule which governs that species of contract . . ." 9 La. at 435-436.
The court then added, as a corroborative afterthought rather than a premise, "and the cost of putting up is trifling, compared with the cost of the article." Id. at 436.[5]
Vico involved a contract for the delivery of ready-mix concrete into a foundation subcontractor's building forms. Vico was simply not a case of a contract to install.
*192 More to the point is Kegler's Inc. v. Levy, La.App. 4 Cir. 1970, 239 So.2d 450, writ refused, 256 La. 1150, 241 So.2d 253. There a contract to furnish and install carpeting was held a construction contract rather than a sale (and the action for damages was therefore not prescribed by the one-year prescription of actions to rescind, or recover damages from, a sale).
The basic distinction between Kegler's and Hunt is that Kegler's had a one-price furnish-and-install contract while Hunt had several sales at individual prices of "various articles", described as marble mantle pieces, chimney pieces and hearths (which one may suppose because of aesthetic considerations were individually selected by the defendant for his house). Hunt expressly rejected, as unsupported by the evidence, the defendant's contention that he had a contract with plaintiffs to build mantle pieces, and found that the mantle pieces were "ready made" and sold as individual items "as detailed in [plaintiffs'] account".
Hunt is thus factually dissimilar to Kegler's and to our case. Hunt is not controlling.
Perhaps in a broad sense it makes no difference in deciding risk (or title) whether one characterize a furnish-and-install contract as construction or as sale. If the installing is a matter of any moment as in the case of wall-to-wall carpeting, or "built-in" kitchen cabinetsone who would characterize the contract as sale must recognize that the home-owner's intent and the contract's intent is not that the home-owner should have rolls of carpet and padding, or crates of cabinets (or unassembled cabinet pieces). If the furnisher-installer "sells" the carpeting or the cabinets, it sells them installed. If the cabinets are the subject of a "sale", the sale is at least one subject to the condition that the seller install. That condition is suspensive: if you install, I will buy (and if you do not install I do not want and will not buy). But the sale subject to a suspensive condition does not transfer the property or the risk of loss to the buyer; C.C. 2471 and 2044; Aubry et Rau, Obligations (La.Law Inst. trans.), § 302a, aa, p. 69.[6]
Obviously some "installing" is so trifling (a word used by Hunt[7]) as not to suspend the sale, as in an agreement to deliver and install an electric refrigerator, when "installing" means merely setting in place and connecting the refrigerator's electric plug into the existing wall outlet. But where installing is anything other than trifling, surely the "buyer" is entitled to insist on the "seller's" performance in full before becoming bound to pay. Suppose a department store "sells" a built-in dishwasher or a room air-conditioner with a promise to install (whether for a separately stated charge is immaterial since the ordinary homeowner wants only one contract, namely for the thing installed). Suppose further that the store merely delivers the appliance, doing nothing towards installing it. The "buyer" surely has not got what he bargained for: if he bargained for the "sale" of the thing, he bargained for it installed that is, subject to the suspensive condition that it first be installed.
Accordingly, we could assume (despite extreme doubt) that sale is the correct legal categorization of a one-price contract to outfit a school science laboratory with wall cabinets and laboratory tables with troughs, gas, water, distilled water and *193 drain lines, all to be permanently affixed and precisely fitted to floor and walls (except that final gas, water and drain connections and electrical supply are to be provided by another party). Even so, we must hold that the "sale" is subject to a suspensive condition of installation which was not fulfilled and the property and risk of loss therefore remained with the "seller", C.C. 2471. Accordingly the school board suffered no loss of its property and its insurer is not liable. The judgment against the insurer must therefore be reversed.

Decree
The judgment appealed from is reversed and the demands of plaintiff against Louisiana Joint Underwriters of Audubon Insurance Company and of Rowley, Inc. against plaintiff are dismissed. There is further judgment in favor of plaintiff and against Rowley decreeing plaintiff not indebted to Rowley for the $36,148.15 of goods lost by fire. Rowley is to pay all costs except those attributable to plaintiff's demand against Louisiana Joint Underwriters, which plaintiff shall bear insofar as chargeable by law.
NOTES
[1] Rowley argues that the board-Rowley contract is one of sale, in which, ordinarily, the risk of loss falls upon the buyer; La.C.C. 2467. We agree with the board that the present contract, whether sale or construction contract (in which case C.C. 2758 would place the risk of loss on Rowley), makes its own rules which are controlling, as authorized by C.C. 1764(A)(2).
[2] The only informality is lack of "notarial form" which the contract documents specified. Both parties evidently waived this formality while entering into a written contract by written offer (bid) and acceptance ("purchase order"). The only noncompliance with La.R.S. 38:2213, para. 1, was failure of Rowley to supply bond (as to which see n. 3 below).
[3] Q. And I believe in your bid for the job you indicated you were familiar with the general specifications for the job and for the particular specifications that you were bidding on, isn't that correct? A. That's right. Q. And were you familiar with such requirements in there as performance bonds? A. Yes, I was. Q. Were you familiar with the fact that builder's risk insurance was to be obtained? A. Yes, may I state my position on that at this point?

THE COURT: Certainly. A. We realized that this was a contract form. We realized that a performance bond and insurance could possibly be required, but based upon our past experience with the School Board for the last three or four years prior to that, we had never been asked to sign a contract, never been asked to furnish a performance bond, or insurance, or any of these documents, and, of course, these things are initiated by the School Board. We don't initiate them ourself. Q. Well, you were familiar, nevertheless, that those were part of the bid, is that correct, or the proposal that Jefferson Parish had made? A. That's correct.
[4] Rowley's argument that it is not liable for lack of insurance because not put in default by demand fails because, La.C.C. 1933(1), when an obligation is "of such a nature, that it [can] only be [performed] . . . under certain circumstances, which no longer exist, the debtor need not be put in legal delay [i. e., default] to entitle the creditor to damages." The obligation to insure property can only be performed while the property exists.
[5] This cryptic comparison of costs does not appear to merit the emphasis conferred by Comment, 1947, 7 La.L.Rev. 564 (deemed to have formulated "the proper test, and traditional test" by Note, 1972, 32 La.L.Rev. 446, 449). See n. 7 below.
[6] One who has alienated an individually determined thing under a suspensive condition remains owner until fulfillment of this condition. From this follow, among others, the following consequences:

The thing is held at the risk and peril of the one who has alienated it conditionally. Hence, if the thing perishes before the happening of the condition he cannot claim performance of a promise made to him in consideration of the obligation to give which he has assumed. The latter obligation is considered as having never existed for lack of object and the former must be considered as having never existed for lack of cause.
[7] Perhaps Hunt meant that, in the case of comparatively expensiveperhaps unique?marble fireplaces, the cost of installing was so trifling that (in those days when artisans were more plentiful) a homeowner's consent to the purchases would not have been affected even if installation were not available from the seller.